# Weir *against* Hale.

An execution put into the hands of the sheriff and levied upon personal property, with any other than the *bonâ fide* intention of selling the property and making the money, is fraudulent as to subsequent judgment creditors.

In order to postpone an execution under such circumstances, to subsequent executions, it is not necessary that the plaintiff should have given the sheriff notice to stay proceedings; but any arrangement with the defendant, or other conduct of the plaintiff, evincing his intention not to have a sale of the property, will have that effect.

ERROR to the Common Pleas of *Dauphin* county.

Benezer Hale, and other execution creditors of S. B. Hickcox & Co., against John A. Weir. This was a feigned issue directed by the court to try the right to money raised on the sale of the personal property of Samuel B. Hickcox & Co. The plaintiffs, Benezer Hale, Josiah Elder & Co., William Reed and Henry M. Bayard, were respectively creditors of Samuel B. Hickcox & Co., and had each issued writs of *fieri facias* against them, before the sheriff sold their personal property. Each of the plaintiffs claimed to be paid out of the proceeds of the sale, and the court ordered a feigned issue in which they should all join as plaintiffs against the prothonotary as defendant.

The executions came to the hands of the sheriff in the order in which they are here mentioned, and the contest was between the plaintiffs, who was entitled to the proceeds of the sale. After the executions were given in evidence, this testimony was given by the sheriff:

" I had the executions of Reed and Bayard in my hands before the sheriff's sale; levied them on same goods that I levied on executions of Hale and Elder & Co. The morning after I received Hale's execution, I went, in company with him, to the furnace; this was on the 19th of October 1841. I had three executions before Hale's, viz: William A. Brown, Peter K. Miller, and Pennsylvania Bank. I had levied on these three executions a few days before I received Hale's on the 14th of October. I made levy on these three executions. They have been paid by me by order of court. The morning after I levied on Hale's execution, I gave

[Weir v. Hale.]

orders to the manager of the furnace to stop it; Gregg, the manager, said they had ore only to keep them going a few days, but were well stocked with coal and everything else. Hale was present, and said it was a hardship the furnace should be stopped, and he would endeavour to furnish the ore. Mr Gregg or Hale then asked if I would permit them to go on. Hale said he thought there would be a compromise among the creditors, and it would be a pity to stop the furnace; he said he either had or would have in hands, shortly, the means to satisfy the three first executions. I then said I had no objection to their going on with the furnace. Hale said he would allow what was right, for coal, and see the hands paid; Mr Gregg consented to go on, as usual, with blast; nothing said about sale, at that time. Hale thought the matter would be compromised without sale; don't remember that Hale said, on riding up, anything about sale; nothing said about sale till a few days after this, when other executions were put in my hands; after I found there would be a sale, Hale was as anxious as anybody for it to go on.

" Hale never said anything to me about staying these executions. The sale of personal property took place the 11th of November 1841. Reed urged me to advertise the property. About the time, or a little before I advertised, I saw Reed and Bayard in town, in company with Hale."

Samuel B. Hickcox, testified: I owed Hale $131 on the 18th of October 1841, as I believe; I cannot say that Murray owed him the $250, more than I see it on Hale's book; there was a settlement, I believe, by Guthrie, in April; I paid him some, which was credited; the judgment was confessed, in part, to secure to Mr Hale what was due to him; in the next place to secure our personal property, that it should not be sacrificed, in case other executions came against us, and forced sale; in case no other executions came against us, I was to go on with the furnace unmolested; I was to use the stock as I had done; if no other executions should be issued against us, there was to be no sale by sheriff on Hale's execution. It was presumed, that as well stocked as the furnace was, at that time, we could pay our debts; this was the understanding at the time judgment was confessed and execution issued —an amicable judgment. The proposition came from Mr Murray, my partner, who was staying at Hale's, and then from Murray and Hale together; I stopped there, when I came to town; I was on good terms with Hale.

The points put by the counsel of the parties, and the answers of the court, are distinctly stated in the opinion of the court.

*M'Cormick*, for plaintiff in error. The principle contained in all the cases, is, that an execution shall not be used for any other than the *bonâ fide* purpose of making the money by a sale of the property levied. 3 *Rawle* 344; 3 *Wash.* C. C. 60; 1 *Rawle* 366;

[Weir v. Hale.]

3 *Penn. Rep.* 487. Here it is clearly proved that the original terms in which the judgment was given, were to prevent a sale, unless it became necessary in consequence of subsequent events; and, in pursuance of this arrangement, Hale took possession of, and went on to use the property levied by blowing the furnace. That this arrangement was not communicated to the sheriff, was a matter of no moment; the fraud and hindrance to other creditors were equally effectual. 4 *Rawle* 308; 5 *Rawle* 286; 2 *Rawle* 282.

*Ott* and *Herman Alricks, contra,* argued that the arrangement made was not to prejudice creditors, but, on the contrary, to advance their interests and to prevent a sacrifice of the property. The sheriff might have sold at any time, and did actually sell before the return day of his writ; the execution of the process was not, therefore, interfered with; and this is the true test by which the conduct of the plaintiff is to be tried. 4 *Rawle* 308; 3 *Cowen* 272; 11 *Wend.* 548; 6 *Cowen* 284; 3 *Rawle* 344; 5 *Rawle* 286.

The opinion of the Court was delivered by

KENNEDY, J.—The personal property of the firm of Samuel B. Hickcox & Co. having been taken in execution and sold at the suits, respectively, of several judgment and execution creditors, a contest arose between them as to the appropriation of the money made by the sale. The court below, in order to settle the controversy, directed that a feigned issue should be joined, so that the facts might be passed on and decided by a jury. On the trial of the issue, after the giving of the evidence had been closed, the counsel of Reed and Bayard, a party to the issue, requested the court to charge the jury as follows:—"If the executions of B. Hale and J. Elder & Co., respectively, were issued and levied on the personal property of S. B. Hickcox & Co., with the intention to *secure* their claims merely, and not to obtain satisfaction, they are fraudulent and void. Second: If the arrangement made in these cases was, that the executions were to be placed in the sheriff's hands and levied, but there was to be no sale unless other executions came against Hickcox & Co., then the executions, respectively, of Hale and Elder & Co. shall be postponed to those of the other creditors. Third: If, after the sheriff had made his levy under Hale's execution, and ordered the manager of Hickcox & Co. to stop the furnace, Hale made an agreement with Hickcox & Co., and with the sheriff, that he would carry on the furnace and use the stock levied on for an indefinite time, the lien of his execution was thereby lost, and he is not entitled to the money in court."

The court gave the following response:—"The first, second, and third points are answered in the affirmative, with this additional

instruction, that the plaintiffs in the executions referred to, must not only have made this arrangement with the defendants in the executions, but must also have communicated the same to the sheriff, in such manner as to authorize him to suspend the execution of the writs. If the sheriff received no instruction or direction from the plaintiffs in the executions, other than the writs; if the sheriff was not in any manner directed to suspend the execution of the writs, or given to understand that they were suspended, other creditors have no right to object. If Hale made an agreement with Hickcox & Co. and the sheriff, to suspend the execution of Hale's writ beyond the time the sheriff would have sold in obedience to the writ, it is fatal to Hale's execution. If the sheriff was not induced to suspend execution by Hale beyond what he should have done in execution of the writ without other directions, other creditors have no cause of complaint." The counsel for the plaintiffs in error, allege that the court erred in the answers thus given to the questions involved in their three first points, and have made the same the ground of the first two errors assigned.

The court below seem to have entertained the idea, that although the execution first delivered to the sheriff was by agreement between the plaintiff and the defendants in it, placed merely in the hands of the sheriff for the purpose of gaining a preference, and securing the amount of the money mentioned in it, without depriving the defendants in the execution of the use of the property, by taking it out of their possession, or making a sale of it, unless other creditors sued out executions and delivered them to the sheriff, the plaintiff in such first execution would, notwithstanding, still be entitled to a preference over subsequent executions, sued out and placed in the hands of the sheriff, unless such agreement to favour the defendants in the execution were expressly communicated to the sheriff, or he was positively instructed not to proceed to sell, unless other creditors put executions into his hands. In this we think the court was mistaken; for it is not the communication to the sheriff of the fraudulent design with which the execution is sued out and put into his hands, nor the direction of the plaintiff therein to him, in pursuance of such an agreement or understanding with the defendant in the execution, that avoids the first execution as against subsequent executions; but the injurious effect that may be produced by it upon other creditors in its natural tendency to hinder and delay them from proceeding to have execution of their judgments. In order to make the execution first put into the hands of the sheriff, available against those delivered to him subsequently, it is not sufficient that the plaintiff in it has a valid judgment, and that he is entitled to have execution of it; but he must sue out his execution, and deliver it to the sheriff, not merely for the purpose of having his debt secured by creating a lien on the personal property of the defendant, or still

[Weir v. Hale.]

less of protecting the defendant thereby in the use and enjoyment of it, but for the purpose of having his judgment satisfied by a *bonâ fide* execution of the writ as far as it may be practicable. If, therefore, it can be shown that the plaintiff in the execution placed it in the hands of the sheriff, with any other view than that of having it executed *bonâ fide*, and it is 'not so executed, it ought not to be considered good against subsequent executions. The plaintiff may have his purpose answered, in many instances, though fraudulent, without communicating it to the sheriff; for, unless the sheriff evinces his intention to take the actual possession of the property, so as to deprive the defendant of the use of it, the plaintiff, when he wishes the defendant to have the possession and use of it, notwithstanding his execution in the hands of the sheriff, has no occasion to tell the sheriff to leave the property in the possession of the defendant, that the latter may have the use of it, because he sees that the sheriff is disposed to do so without his direction to that effect. And seeing the property so left with the defendant by the sheriff, the plaintiff need not tell the sheriff, that he does not wish him to sell it, as long as the sheriff forbears to make an effort to do so. And other creditors may thus be improperly kept at bay, by the plaintiff's issuing and placing his execution in the hands of the sheriff, for the mere purpose of favouring the defendant, without any wish to enforce the payment of his judgment, and without making his intention known to the sheriff, otherwise than by his not urging or asking him to sell the property. But it is true also, if the plaintiff, even without any previous *concert or collusion* with the defendant, on delivering his execution to the sheriff, directs him to make a seizure of the defendant's personal property, but not to take it from him, or to sell it without further orders, for he expects the debt will be settled or paid without that; or if he give any direction to the like effect, his execution will not be good against subsequent executions at the suit of other creditors. And this would be the case, though the plaintiff may not thereby intend to hinder, delay or defraud other creditors, but to hasten the debtor merely to pay. The authorities cited and relied on by the counsel for the defendant in error prove this latter position. But it would be anomalous and strange, if the first execution, in the latter case, should not avail against the subsequent executions, when nothing like fraud or injury to other creditors was intended, and yet prevail in the former case, where the great object of issuing and placing it in the hands of the sheriff, was to cover the property from the executions of other creditors, and give to the defendant the actual use of it as long as possible. But Mr Hale in this case, who had the first execution in the hands of the sheriff, would seem, from the evidence, to have gone much further, than giving a bare direction to the sheriff not to proceed under his execution as the law required, for he actually took possession of the property himself, by the con-

III. — 37

[Weir v. Hale.]

sent of the defendants or their agent, to the entire exclusion of the sheriff, and used and disposed of a considerable portion of it, without accounting to the sheriff, or giving credit on his execution, for it. This, if believed by the jury, was undoubtedly sufficient to postpone his execution, because it was a most unwarrantable misapplication, if not embezzlement of the property which ought either to have been applied to the payment of his own execution, if just, or those of the other creditors. We therefore think that the court below erred in their instruction to the jury on the three first points submitted by the counsel of Reed and Bayard.

The third error is an exception to the answers given by the court to the first and second points, submitted by the counsel below of Elder & Co., also a party to the issue. By the first the court was requested to instruct the jury, " if they believed that there was an arrangement and understanding between Benezer Hale and Hickcox & Co., that the execution of B. Hale should be issued, not for the purpose of having a sale of the personal property levied on, but only that the levy should be made to secure the debt, the execution was no lien as respects the other execution creditors; and B. Hale had no right to any part of the money in court." And further, by the second point, " that if such arrangement or understanding existed, by which no sale was to be made on B. Hale's execution, unless or until some other executions were issued, the law was the same." The court answered both these points in the affirmative, with this further instruction, that to destroy the lien of Hale's execution, the arrangement referred to must have been communicated to the sheriff in such manner as to authorize him to suspend the execution of the writ, otherwise the lien of Hale's execution would not be lost to him in favour of other creditors." These points, as also the answers given to them by the court, being substantially the same with those of Reed and Bayard, which we have noticed above by showing that the court erred in their answers to them, require no further discussion in order to prove the error of the court in answering them.

The fourth error is an exception to the answer, given by the court, to the third point submitted by the counsel of Elder & Co. By this point the court was requested to instruct the jury, " that if they believed the testimony of John Fox, the sheriff, that Benezer Hale, on the day after issuing his execution, went to the furnace of the defendants therein named, with the sheriff; was present with the sheriff when he made the levy under it, and ordered Mr Gregg, the manager of the furnace, to stop it; that Mr Hale then interfered, by saying it was a pity the furnace should be stopped, and undertook, with the consent of the sheriff, to carry on the furnace himself, using for that purpose the property levied on under his execution, for an indefinite time, and saying nothing to the sheriff about making sale of the property levied on; this was in effect an order by Benezer Hale to the sheriff to stay proceedings on his

[Weir v. Hale.]

execution; Benezer Hale's execution was thereby postponed, and he had no right to any part of the money in court; or if the jury should believe, from the testimony of sheriff Fox, the facts to be as stated in this point, it was a virtual stay of the execution by Hale, and the law would be the same." To this the court answered: " It is referred to the jury to decide whether Hale, by his communication with the sheriff, authorized him to suspend the execution of his writ, beyond what he would have done without the interference of Hale, whether Hale in any manner instructed or authorized the sheriff to stay proceedings on his writ. If he left the sheriff to proceed in the execution of his writ, in all respects, as commanded by the writ, he lost no preference, although pending the time between the levy and sale, he may with permission of the sheriff have directed the manager at the furnace to continue to blow it, and have supplied him with materials for that purpose." We are clearly of opinion that the court erred in their answer on this point; for if it be true that Mr Hale did so interfere, as to have the property seized on, or liable to be seized on, by the sheriff, diverted from the executions, so that the sheriff could not perform his duty as he ought to have done, by taking and selling it, for the purpose of satisfying the executions, as far at least as it would go, it was even worse, as regarded the other creditors, than telling the sheriff not to proceed and sell under his execution; for if he had merely done the latter, the other creditors might possibly have gotten the benefit of the property so disposed of by Mr Hale under their executions. Such conduct was unquestionably sufficient to preclude him from claiming any of the moneys made by the sheriff, until after the other executions, under which the sale of the remaining property was made, were first satisfied.

Judgment reversed, and *venire de novo* awarded.